DECISION
This matter is before the Court for decision after a jury-waived trial concerning the purchase of a truck by plaintiffs' decedent from the defendant dealership.
Plaintiffs' decedent suffered from chronic bi-polar disorder with manic depression for most of her adult life. She remained dependent upon her husband until his death in March of 1991. In that same year she came under the care of Dr. Farrell I. Klein, a board-certified psychiatrist, and current Clinical Director of Newport County Mental Health Center. Medical records reveal that as early as 1969, the decedent had been treated for manic depression. (See E and C "Closing Progress Note" dated October 20, 1982.) Prior to the events in controversy, Dr. Klein had diagnosed plaintiffs' decedent, Rosemary Dillworth, with the aforementioned affliction. He described three different types of episodes experienced by such patients. During a manic episode, which can last a week or more, an afflicted person may display inflated self-esteem, grandiosity of thinking, decreased need for sleep, flight of ideas, distractability, increased goal-directed activity and/or excessive pleasure-seeking activity, including buying sprees or making foolish investments.
During a "depressive episode", patients may exhibit lower energy levels, sleep disturbances, sadness and mood inconsistency. Some patients, such as Mrs. Dillworth, display "extra" psychotic features.
A combination of mania and depression can also occur — this is called a "mixed episode". Patients who suffer from bi-polar disorder can be successfully stabilized with therapeutic amounts of medications such as Lithium and/or the anti-psychotics, Thorazine and Mellaril.
By 1992, Rosemary Dillworth had had a number of hospitalizations, both voluntary and involuntary, as a result of her mental illness. On March 23, 1992, she was involuntarily committed to Newport Hospital after lighting fires in her home. She remained there for approximately ten days and was discharged after being normalized with medications. Less than one month later, in early May of 1992, Mrs. Dillworth became non-compliant with her prescribed medications. Although symptoms of her illness were emerging as she decompensated, she maintained an appearance of rationality. On May 15th, Mrs. Dillworth's son appeared at Newport County Mental Health Center requesting that his mother be hospitalized. It was determined that Mrs. Dillworth did not meet the criteria for involuntary hospitalization.
On the following day, Saturday, May 16th, Mrs. Dillworth telephoned the defendant dealership to inquire whether it had any full-size trucks in stock. Robert Landry, Jr., one of defendant's sales specialists testified that there was a very minimal selection in the category of Mrs. Dillworth's interest. Although he thought it odd that she wanted the truck fitting her specifications to be driven to her home, he complied with her request because her deceased husband had been a long-standing customer. When Mr. Landry arrived, Mrs. Dillworth explained that she was purchasing the truck to motivate her son to engage in painting and contracting jobs. Mr. Landry, describing the decedent as "forthright, insistent and demanding," then wrote up a sales agreement without the contingency of the son's approval of the vehicle. Mrs. Dillworth wrote out a check for $18,530 (dated May ____, 1992) without negotiation and without ever driving the truck. (In fact, she had no license to drive.) A purchase agreement, dated May 20, 1992, was signed by Mrs. Dillworth. Her signature does not appear on the odometer disclosure statement, nor does it appear on the state application for registration and title/certificate of same date. Curiously, that form bears a notarization to a blank. The notary attests that the vehicle owner has sworn to the accuracy of the application, yet Mrs. Dillworth never signed it.
Furthermore, the rules and regulations governing motor vehicle sales require that "all sales transactions must be made from the dealer's licensed place of business." (See exhibit 17.) According to Theresa Phillips, the Rhode Island Registry's Chief Investigator, a dealer, per the aforementioned provision, cannot conduct business off dealership premises. She opined that conducting a sales transaction at a customer's home was not legal, and could result in the suspension of the dealership's license. Also, consignment sales by a dealer are impermissible. The dealer must have lawful ownership and title to any vehicle offered for sale. Mrs. Phillips explained that Rosemary Dillworth never owned the truck because no title was ever issued to her.
Furthermore, it was impermissible for the dealer to offer to decedent's daughter, Dana Dillworth, to take the truck back on a consignment basis. As soon as Ms. Dillworth discovered that her mother had purchased the truck, she telephoned the dealer-ship imploring the manager to take the truck back, explaining that her mother was "not in her right mind." She was told that that was not possible because the sale was closed and the dealer would buy it back only at a "used wholesale price." The dealer then offered to place the truck on its lot and try to sell it, taking a percentage of the proceeds. At this point, the truck had not even been driven. Ms. Dillworth then requested the mental health advocate to intervene. The mental health advocate wrote a letter to defendant, explaining that Mrs. Dillworth was mentally disabled and incompetent to enter the sales contract. (Exhibit 2B). The truck still had never been used and the advocate requested a rescission of the sale. These efforts were rebuffed as well. Ultimately, the decedent's children/permanent co-guardians were compelled to sell the truck to Elmwood Dodge for $10,500.
Approximately one month after the purported sale of the truck, Dana and Jonathan Dillworth were appointed permanent guardians for their mother. During May and June, in addition to one check to defendant dealership, Mrs. Dillworth had written a check to a dead relative for $1,000,000; a check to singer Willie Nelson for $1,380 (signing her maiden name); a check for $1,385 to defendant auto center on its face has the writings: "Richard PromShoe," "W.W.W. John W. Point," "Jockey Palmer Hanes," "Shoemaker", "Club Foot Bonie," "F.O.P. Cincinnati Reds and Sox," "Buck Road," "15 BB Buck," and "Osteoritist;" and, a check to the Registry of Motor Vehicles for $1,380 bearing the writings: "Get me to the church on thyme time," "Topflite xxxxxx," "Wee Willie Winkle," "Watson Shoemaker Willie Shoe," "XL," "Enlarged," "Dodge and Chrysler," "Plus II Spaulding," and "Ding Dong Chime." (See Exhibit 15.) By June 11, 1992 Mrs. Dillworth had been involuntarily hospitalized at Butler after waving a gun around stating she would kill people she "didn't like."
Despite the fact that Mrs. Dillworth had been decompensating since April, her medical records indicate that she could present a rational appearance. While Mr. Landry acknowledged that the transaction was "unusual", there is nothing to suggest that at the time he interacted with Mrs. Dillworth, her behavior was bizarre. The Court finds the testimony of Mr. Landry to be credible and concludes that he had no notice of her condition, and in no way attempted to take advantage of an "incompetent."
However, by July 2, 1992 when Dana Dillworth informed defendant's representative that her mother was "out of her mind" defendant clearly had notice of the problem. After rejecting Ms. Dillworth's reasonable request for defendant to retrieve the truck and issue a refund, defendant compounded the problem by offering to sell the truck on its lot for a commission. (This is not permitted by the rules and regulations governing dealerships.) Even when defendant had written notice of the decedent's mental incompetence from the State's advocate, it refused to rescind. Title did not issue to the guardians until July 16, 1992, two weeks after defendant was placed on notice of the decedent's impairment. The dealer could have easily filed an "Abatement of New Car Title" to withdraw the application for the title to issue to Rosemary Dillworth. This TR-6 form is the one which would be used if a dealer determined, for example, that a minor was attempting to purchase a vehicle. In any event, the defendant, at this time, remained the titled owner of the vehicle. Clearly, good faith and fair dealing would require the defendant, at this juncture, to accept the truck (which it still legally owned) back. Moreover, the "sale" was not conducted in conformance with the regulations mandating that . . . all sales transactions be made from the dealer's licensed place of business. No dealer shall display a vehicle other than at his place of business." (See Exhibit "D"). This provides another basis for the voidability of the sale.
It must be noted that no single representative of defendant corporation followed or had knowledge of the events which ensued after the day the truck was delivered to the Dillworth home. After Mr. Landry's single interchange with Mrs. Dillworth on that day, he heard nothing about the transaction until two months later, from the general manager. There is not even a suggestion that the owners and/or officers of the defendant corporation had any idea that these events were taking place. Nonetheless, the law requires that corporations be held responsible for acts performed by their authorized agents, within the scope of the business.
In this case equity and law would have required the defendant, after notice of decedent's mental incompetence, to retrieve the truck (which was in exactly the same condition as when deposited in the driveway) and return the check. The co-guardians, in good faith, after being rejected by defendant, sold the truck to another dealership. They could not advertise the truck, or allow a third party test-drive it, because the truck was uninsured and unregistered. The Court finds that they exercised their duty to act in good faith by selling the truck to another dealer for $10,500. The Court finds that plaintiffs are entitled to recover the deficiency of $8,030.
With reference to plaintiffs' claim for $1,380 based on contract fraud, the Court rules in favor of the plaintiff. This sum was paid to the Registry of Motor Vehicles but not as the proximate result of defendant's conduct. The defendant was not the payee and was not enriched by this sum.
There is nothing in the record to support a claim for punitive damages which require a finding of conduct so outrageously wicked that it amounts to criminality. As to this claim the Court rules in favor of the defendant.